IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


SWAN B. MOSS, III, *et al.*                                                    PLAINTIFFS


v.                              CONSOLIDATED ACTION
                                   Case No. 4:12-cv-4030

UNITED STATES OF AMERICA                                                        DEFENDANT


## ORDER

Before the Court is a Motion to Dismiss for Lack of Subject Matter Jurisdiction filed by

Defendant United States of America ("the government").  ECF No. 31.  After the parties conducted

limited jurisdictional discovery, Plaintiffs filed a response to the government's motion.  ECF No. 52.

The government has filed a reply.  ECF No. 58.  The Court finds the matter ripe for its consideration.

## I.  BACKGROUND

This is a consolidated action comprised of eleven similar cases arising from the deaths of

twenty campers in a tragic flood incident in June 2010 at the Albert Pike Recreation Area ("APRA").

The APRA is located adjacent to the Little Missouri River in the southern portion of the Ouachita

National Forest in Arkansas.  The APRA is a public recreation area managed by the United States

Forest Service, an agency of the United States Department of Agriculture.  In 2000, Congress made

a special $600,000.00 appropriation to renovate and expand the facilities at the APRA.  The Forest

Service decided to renovate existing APRA campsites and to develop new campsites in an area that

would be known as  Loop D.[1]

---

[1]The APRA already had three developed camping areas along the Little Missouri River—Loops A, B, and C.  All three
Loops contained developed camping facilities, including picnic tables, camping pads, bathhouses, and parking.  No
electrical hookups were provided in these Loops.

A. *The NEPA Process*

The National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321, *et seq*., requires federal agencies to assess the environmental effects of their proposed actions prior to planning and decision-making. Typically, a NEPA coordinator at an agency would oversee all aspects of the NEPA process. The NEPA coordinator would assemble an interdisciplinary team to assess and provide input as to all of the environmental aspects implicated by the proposed project. The NEPA coordinator would then combine the team's findings and recommendations into an environmental assessment, which is a formal document disclosing the effects a proposed project will have on resources. Once the public and the interdisciplinary team had an opportunity to weigh in on the environmental assessment, the responsible official would issues a decision notice.

The Forest Service was required to employ the NEPA process prior to the development of Loop D at the APRA. In this case, District Ranger James Watson acted as the NEPA coordinator for the Loop D project by identifying the proposed action, assembling the interdisciplinary team, and authoring the environmental assessment. As the District Ranger, pursuant to Forest Service Policy, Watson was also responsible for issuing the decision notice to proceed with the Loop D project. Although it was uncommon for one person to assume both roles, Ranger Watson was not prohibited from doing so.[2]

The first step in the NEPA process requires the submission of a scoping letter to generate public comments. The only public comment in the project file regarding the development of Loop D came from the owners of a private recreational vehicle ("RV") campground located across from

---

[2]Ordinarily, a NEPA coordinator would author the environmental assessment, and the District Ranger would serve as the deciding official.

the proposed Loop D.  These owners were concerned that the Forest Service would charge a lower fee for use of the proposed APRA RV sites than they were charging at their private RV park.

Ranger Watson assembled an interdisciplinary team of Forest Service Specialists to consider the biological, social, and economic factors pertinent to the decision on the improvements at the APRA.  He engaged both Ken Luckow, a soil scientist, and Alan Clingenpeel, a hydrologist, to provide input on the project.[3]  After evaluating the proposed site, Luckow submitted a written report finding that Loop D was located within the 100-year floodplain.  Mr. Clingenpeel separately conducted a field evaluation and determined that Loop D was not within the 100-year floodplain,[4] but he did not issue a written report.

### 1.  Luckow's Report

The APRA project was Luckow's first time conducting a soil analysis for a recreation project. Luckow visited the proposed site in 2001 and prepared a report based on his observations and information gleaned from soil maps.  Luckow determined that most of the area where the new Loop D campsites were proposed should be considered as being within the 100-year floodplain.  ECF 52-10, p. 2.  Luckow estimated that this area was "subject . . . to only rare flooding events (i.e. 1-2 times per 100 years)."   ECF 52-10, p. 2. He recommended that signs be posted warning campers of possible flash floods and that the proposed additional campsites should be developed as primitive camping only with no electricity, water, or sewer hookups.  ECF 52-10, p. 2.

### 2.  Clingenpeel's Opinion

In his deposition, Ranger Watson testified that he  knew Luckow's report was based on soil

---

[3]These were not the only two specialists that Ranger Watson engaged to provide input on the project.  These two specialists, however, provided information regarding the 100-year floodplain that is pertinent to the lawsuits at issue.

[4]Land located within the 100-year floodplain has a 1% annual chance of flooding.

maps and that soil maps were created on such a scale that it could make it difficult to determine where the floodplain begins and ends. Thus, following receipt of Luckow's report, Ranger Watson requested that Alan Clingenpeel, the District Forest Hydrologist, visit proposed Loop D and give his opinion as to the location of the floodplain at the proposed campsite. As part of his work, Clingenpeel had conducted field assessments of floodplain locations and had determined the location of 100-year floodplains at least one dozen different times. Ranger Watson and District Recreation Technician Tom Ledbetter were present for Clingenpeel's assessment of the Loop D site. The exact location of the proposed site was not identified for Clingenpeel, but Ranger Watson provided Clingenpeel with a rough identification of the proposed site.

In evaluating the floodplain at Loop D, Clingenpeel used the double bankfull method, which was generally used by forest hydrologists at the time to determine the location of 100-year floodplains. Relying on this double bankfull field method for determining the upper edge of the 100-year floodplain, Clingenpeel concluded that Loop D was not within the 100-year floodplain. At the end of the assessment, Watson told Clingenpeel that the location of the 100-year floodplain, as measured by Clingenpeel, was at the elevation of the lowest of the proposed campsites. Clingenpeel never submitted a written report documenting his findings. Clingenpeel, however, told Ranger Watson that, based on the 100-year floodplain elevation Clingenpeel had measured, he did not see any problems with the project.

### 3. Environmental Assessment and Decision Notice

After receiving input from forest specialists and performing other work related to the assessment, Ranger Watson drafted the environmental assessment ("EA"). In accordance with the NEPA, Ranger Watson addressed the reasons for the renovation and the creation of Loop D. He

cited the heavy use and lack of upkeep of the APRA developed campsites as a reason for undertaking the project.  He also noted that there was great demand for electrical and water hookups by APRA campers.  The EA outlined a proposal in which Loops A, B, and C would be improved, and Loop D would be built with electrical, sewage, and water hookups.

The EA addressed the environmental, socio-economic, and public safety impacts of the project.  Regarding the daily camping fees, the EA stated that the private campground bordering the APRA had electrical, water, and sewage hookups and noted that improvements to the APRA would result in competition with the private campground for those services.  Ranger Watson stated that because of the improvements, the daily camping fees in the federal area of the APRA would be increased to make the fees comparable to the rates charged at the private campground.

Concerning public safety and the proposed Loop D, the EA contained the entirety of Luckow's soil analysis and his determination that most of the area where Loop D was proposed should be considered in a floodplain.   ECF No. 52-12, p. 15.   The EA noted Luckow's recommendation that the campsites remain primitive.  In the next section, however, Ranger Watson concluded that the proposed Loop D was not within the 100-year floodplain, presumably relying on Clingenpeel's assessment.[5]  ECF No. 52-12, pp. 13 and 16.  The EA stated that, as a mitigation measure, signs would be posted warning the public of possible flash floods.

Watson circulated a draft of the EA among members of the interdisciplinary team, including Luckow and Clingenpeel.  Luckow reviewed the soils portions of the EA and offered some minor corrections.  Clingenpeel also  reviewed the portions of the EA addressing water quality and did not

---

[5]The EA stated that the Forest Soil Scientist (Luckow) and the Forest Hydrologist (Clingenpeel) inspected the area and provided their input regarding the project.

offer any comments.  On December 9, 2002, the Forest Service issued the EA, and a 30-day comment period was opened.

After the comment period closed, on January 17, 2003, Ranger Watson signed a Decision Notice approving and implementing the preferred course for the APRA renovation project outlined in the EA, which included the development of Loop D.  The Decision Notice listed nine reasons for the action, one of which was the increase in recreation fee revenue.  The Decision Notice outlined the process for administrative appeal, but no one challenged the decision.  In July 2003, the APRA renovation project was completed, but signs warning the public of possible flash floods were never posted.

### B.  The June 2010 Flood

On June 10 and 11, 2010, there was heavy rainfall in Montgomery County, Arkansas, causing a rapid rise in the Little Missouri River and its tributaries.  In the early morning hours of June 11, a flash flood occurred where the river overran its banks into Loop D and the surrounding areas of the APRA.  According to the United States Geological Service, the river rose over twenty (20) feet between 2:00 a.m. and 5:30 a.m.  Twenty campers perished in the flood.  Some of these campers were camping in Loop D.  Others were camping upstream from Loop D, along Road 512 in the Ouachita National Forest.  In 2012, based on the United States Geological Service's computer modeling of the post-flood data available, a research study concluded that the campsites within Loop D were within the 100-year floodplain.

In the consolidated action, Plaintiffs have filed suit against the government pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, alleging that the negligence of the government caused the death of the campers who perished in the flood.  The government

asserts that subject matter jurisdiction is lacking under the FTCA because the Arkansas Recreational Use Statute ("ARUS"), ARK. CODE ANN. § 18-11-301 *et seq*., provides the government with immunity.

## LEGAL STANDARD

The government has filed its motion pursuant to Rule 12(b)(1), which requires the Court to dismiss any and all claims over which, either on its face or in light of outside evidence, it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Under Rule 12(b)(1), subject matter jurisdiction can be challenged by either a facial attack or a factual attack. *Osborn v. U.S.*, 918 F.2d 724, 729 (8th Cir. 1990). A facial attack challenges subject matter jurisdiction based solely on the allegations appearing on the face of the complaint. A factual attack is dependent upon the resolution of facts to determine whether subject matter jurisdiction exists. *Id*.

Here, the government contends that the Court is without proper subject matter jurisdiction based on immunity provided by the ARUS. Because the government raises a factual challenge to the Court's subject matter jurisdiction, no presumptive truthfulness attaches to Plaintiffs' allegations, and the existence of disputed material facts will not preclude the Court from evaluating the merits of the jurisdictional claims. *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 861 (8th Cir. 2013). Further, the Court may consider matters outside the pleadings to determine whether subject matter jurisdiction exists. S*ee Harris v. P.A.M. Transport, Inc.*, 339 F.3d 635, 637, n.4 (8th Cir. 2003). Because Plaintiffs invoke the Court's jurisdiction,  they have the burden of proving jurisdiction by a preponderance of the evidence. *See OnePoint Solutions, LLC v. Borchert*, 486 F.3d 342, 347 (8th Cir. 2007).

## DISCUSSION

In each of the present cases against the government, the claims arise under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680. Under the act, the government "is entitled to the benefit of state recreational use statutes, if applicable." *Wilson v. U.S.*, 989 F.2d 953, 955-56 (8th Cir. 1993). Here, the government asserts that it is not liable in connection with Plaintiffs' injuries because it enjoys the protection of the ARUS, which provides:

> [A]n owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes or to give any warning of a dangerous condition, use, structure, or activity on the premises to persons entering for recreational purposes.

Ark. Code Ann. § 18-11-304. The purpose of the ARUS is "to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." Ark. Code Ann. § 18-11-301. In the present cases, there is no dispute that Plaintiffs were visiting the APRA for recreational purposes. Thus, the ARUS is applicable and inuring to the government's benefit.

Although the ARUS limits the liability of a landowner who opens up his land for recreational purposes, the statute "does not limit a landowner's liability for 'malicious, but not mere negligent, failure to guard or warn against an ultra-hazardous condition . . . actually known to be dangerous' or where the landowner 'charges the person or persons who enter or go on the land for the recreational use thereof.'" *Carlton v. Cleburne Co.*, 93 F.3d 505, 509 (8th Cir. 1996) (quoting Ark. Code Ann. § 18-11-307). Plaintiffs contend that, pursuant to these two exceptions to the ARUS, the government is liable for their injuries.

-8-

A.  § 307(1) Exception

The ARUS does not limit a landowner's liability for malicious failure to guard or warn against an ultra-hazardous condition actually known to the owner to be dangerous.  Ark. Code Ann. § 18-11-307(1).  The Court will discuss whether the government had actual knowledge of an ultra-hazardous condition, whether the government's conduct was malicious, and whether an ultra-hazardous condition existed.

1.  *Actual Knowledge*

The Arkansas Supreme Court has noted  that "for invocation of the exception and resulting liability, the ultra-hazardous condition, structure, personal property, or activity must be *actually known to the owner to be dangerous.*"  *Roeder v. U.S.*, 432 S.W.3d 627, 632 n. 5 (Ark. 2014) (emphasis added).  Thus, Plaintiffs must show that the government had actual knowledge that Loop D was subject to flooding that was dangerous to campers.

Plaintiffs allege that Ranger James Watson was aware that the APRA campsites and the location of Loop D were subject to frequent, dangerous flooding.  To support their argument, Plaintiffs state that there is documented evidence of prior flooding in the APRA, that Ranger Watson had personal knowledge of flooding in the APRA, and that Ken Luckow informed Watson that the area where Loop D was proposed was within a 100-year floodplain.

Plaintiffs state that there were at least ten documented flood events in the APRA between 1940 and 2010.  ECF No. 52, p. 60.  The APRA, however, is comprised of 200 square acres of forest land.  ECF No. 58, p. 35.  Thus, even though flooding could have occurred within or near the area commonly referred to as the APRA, it does not necessarily mean that flooding occurred in or around Loops A-D.  From 2000-2003—during the conception, development, and construction of Loop

D—six incident reports of flooding were filed, none of which affected Loops A through C or the area that would eventually become Loop D. ECF No. 58, p. 37. No injuries were reported in any of those incidents. In 2004, after Loop D was constructed, there was one documented flood event where officers were called to assist campers in Loop C during heavy rains. Again, no injuries were reported and it appears that Loop D was not affected. In 2008, Hurricane Gustav caused a portion of the Loop D parking lot closest to the river to flood and buckle. No injuries were reported relating to this incident. The evidence shows that all but one flooding incident occurred away from Loop D and none of the floods resulted in injuries to people. Thus, these incidents do not support Plaintiffs' claims that the government had actual knowledge of dangerous flooding at the area where Loop D was built.

Plaintiffs argue that Ranger Watson was personally aware of flooding in the area. In his deposition, however, Ranger Watson stated that he had never been aware of any flooding in the location where Loop D was eventually built. ECF No. 57-2, p. 13. He further stated that the river would flood parts of the APRA maybe twice a year, but he did not characterize it as the type of flooding that would threaten campers. ECF No. 57-2, p. 23. Ranger Watson stated that he was aware of approximately three times over his 20-year career in the Ouachita National Forest when parts of campsites closest to the river in Loop C had flooded, resulting in two units of tent campers being moved. ECF No. 57-2, pp. 24-25. No one was injured as a result of any of the flooding, and the worst result was that some camping equipment had water damage. ECF No. 57-2, p. 25. Nothing in Ranger Watson's deposition testimony supports Plaintiffs' argument that Ranger Watson had actual knowledge of dangerous flooding at the Loop D location.

Plaintiffs argue that Ken Luckow's soil map assessment informed Ranger Watson that the area where Loop D was proposed was within a 100-year floodplain, and thus Watson was aware of potential dangerous flooding.  There is no dispute that Ken Luckow determined that the area where Loop D was proposed would be located in a floodplain.   Watson, however, sought another professional opinion on the location of the floodplain from Alan Clingenpeel, District Forest Hydrologist.   Clingenpeel conducted a double bankfull method field assessment in Watson's presence and informed Watson that the proposed location of Loop D was above the floodplain. Moreover, in his deposition, Luckow testified that Clingenpeel, as the District Forest Hydrologist, would have had "the best available information" on the location of the floodplain.  ECF No. 57-12, p. 44.  Watson chose to rely on Clingenpeel's opinion that the proposed location of Loop D was above the 100-year floodplain.

Even if Watson had ignored Clingenpeel's opinion and relied on Luckow's report, the report did not give Watson any reason to think that the location would pose a serious threat of injury or death to campers.  Luckow stated in the report that the proposed area of Loop D was probably subject to "only rare flooding events (i.e. 1-2 times per 100 years)."  ECF p. 52-10, p. 2.  Luckow further stated that "it would be advisable to plan these proposed campsites as only primitive camping areas" and that "[t]hings such as electricity, water, and sewer hookups should not be planned."  ECF No. 52-10, p. 2.  Although Luckow indicated that possible flooding could pose a threat of harm to infrastructure, nothing in either Luckow's or Clingenpeel's assessment of the area would lead to a conclusion that the proposed Loop D site posed a serious threat of injury or death to campers.

In a similar Arkansas case involving the ARUS and a collapsed bridge, the Eighth Circuit affirmed the district court's decision that defendants did not maliciously fail to warn of an ultra-

hazardous condition. *Carlton v. Cleburne Cnty, Ark.*, 93 F.3d 505 (8th Cir. 1996). In that case, there was evidence that the defendants knew of the deterioration of the bridge and had campaigned for its inspection and repair. *Id.* at 511. After an inspection, however, engineers deemed the bridge sound. *Id.* Because of this declaration by the engineers, the Eighth Circuit reasoned that there was no evidence the defendants knew the bridge was dangerous. *Id.* Similarly, in the present case, Plaintiffs have failed to show that the government actually knew Loop D was in a floodplain or that its location posed a danger to individuals camping there.

### 2. *Malicious Conduct*

Even if the government had actual knowledge that Loop D was in a floodplain or that its location posed a danger to individuals camping there, the result in this case would be the same because the Court finds that the government did not act maliciously by failing to guard or warn of an ultra-hazardous condition. To invoke the § 307(1) exception, Plaintiffs must establish that the government engaged in "malicious, but not mere negligent, failure to guard or warn against an ultra hazardous" condition or activity. Ark. Code Ann. § 18-11-307(1). Malicious conduct under the ARUS includes intentional acts of misconduct as well as "conduct in reckless disregard of the consequences from which malice may be inferred." *Roeder v. U.S.*, 432 S.W.3d 627, 635 (Ark. 2014).[6] Plaintiffs allege that the government acted maliciously by failing to guard or warn against the dangers associated with flash flooding.

---

[6] In a member case, *Roeder v. U.S.*, 6:12-cv-6120 (W.D. Ark. filed Oct. 18, 2012), this Court certified to the Arkansas Supreme Court the question of whether the "malicious" conduct standard provided in Ark. Code Ann. § 18-11-307(1) includes conduct in reckless disregard of the consequences from which malice may be inferred. The Arkansas Supreme Court answered the question in the affirmative and issued its decision on April 10, 2014. *Roeder v. U.S.*, 432 S.W.3d 627 (Ark. 2014). In 2015, Ark. Code Ann. § 18-11-302 was amended to define "malicious" under the ARUS to mean "an intentional act of misconduct that the actor is aware is likely to result in harm" and to clarify that "[m]alicious does not mean negligent or reckless conduct." Ark. Code Ann. § 18-11-302(4). This amendment does not apply retroactively and thus does not apply to this case.

In *Carlton*, the Court held that there was no evidence that the defendants knew the bridge was about to collapse and no evidence they continued their course of conduct with a conscious indifference to these consequences. *Carlton*, 93 F.3d at 511. Similarly, the Court finds in the present case that there is no evidence that the government knew that Loop D was in a floodplain or that its location posed a danger to individuals camping there and no evidence that they constructed and maintained Loop D in reckless disregard of the consequences.

The EA stated that warning signs regarding possible flash floods would be posted in Loop D; however, the Court is unaware of any rule or regulation that required the warning signs to be posted. Further, although the exact reason for the failure to post the signs is unclear, there is no evidence that anyone at the Forest Service made a conscious decision not to post the signs. Moreover, the government relied on the expert opinion of Clingenpeel, the District Forest Hydrologist, in locating the floodplain, and the government built Loop D outside of the floodplain as identified by Clingenpeel. At least until June 2010, the government believed that Loop D was developed outside the 100-year floodplain and that any possible flooding posed no threat of serious danger to campers in Loop D. There was no evidence of past catastrophic flash flooding, dangerous flooding, or any significant flooding in Loop D. Based on these facts, the Court cannot conclude that any reliance on Clingenpeel's opinion or any failure to take mitigation measures against the risk of a dangerous flood was malicious conduct within the meaning of the § 307(1) exception.

### 3. Ultra-hazardous Condition

Plaintiffs contend that the government intentionally built Loop D in an area prone to frequent flooding, creating an ultra-hazardous condition. "A condition is ultra-hazardous if it (1) cannot be performed without a risk of harm to the person or another, regardless of any precautions taken; and

(2) does not normally occur in that community." *Carr v. Nance*, 370 S.W.3d 826, 838 (Ark. 2010) (approving a jury instruction that included this definition of "ultra-hazardous" pursuant to the ARUS). Similarly, in cases involving claims of strict liability, the Arkansas Supreme Court has declared that an activity is ultra-hazardous "if it necessarily involves a risk of serious harm to the person or chattels of others that cannot be eliminated by the exercise of the utmost care and is not a matter of common usage." *Mangrum v. Pigue*, 198 S.W.3d 496, 499-500 (Ark. 2004) (citing *Zero Wholesale Gas Co. v. Stroud*, 571 S.W.2d 74 (Ark. 1978)).

Developed campsites are placed along waterways in floodplains throughout Arkansas and the United States despite the risk of flooding, and it is common for people to camp near rivers and streams to enjoy the recreational opportunities that these locations offer. ECF No. 58, pp. 31-33. Thus, placing Loop D in an area that was ultimately determined to be a floodplain cannot satisfy the definition of "ultra-hazardous condition." Further, Plaintiffs cannot show that placing developed campsites in floodplains involves a risk of harm that cannot be eliminated. In fact, Plaintiffs claim that the government could have eliminated the risk of harm by providing the public with adequate notice of the possibility of flash flooding in Loop D. By definition, if harm can be eliminated, a condition is not ultra-hazardous.

Plaintiffs argue that the present case is similar to *Carr v. Nance*, 370 S.W.3d 826 (Ark. 2010). In *Carr*, a man was injured while driving an all terrain vehicle ("ATV") on a paved road within the former Dogpatch theme park property. The owner of the property had given the man permission to drive the ATV on the property. In an effort to prevent trespassing and vandalism, an agent of the owner had strung a steel cable across the paved road. The cable was not marked and there were no warning signs in place. The ATV driver did not see the cable in time to avoid it and, consequently,

-14-

sustained serious neck injuries.  Testimony revealed that the owner's agent had put the cable up seconds before the man ran into it and that the agent knew there were guests on the property driving on the paved roads.  *Carr*, 370 S.W.3d at 829-34.

The trial court ruled that the stringing of the steel cable across a road to prevent access created an ultra-hazardous condition for purposes of the ARUS.  The Arkansas Supreme Court approved the following reasoning from the trial court's order:

> It does not appear that stretching a well-marked cable of a reasonable height across a road in an area where it is reasonably visible to persons traveling the road is an ultra[-]hazardous activity and it appears that such action is done commonly.  But here, substantial evidence provides a basis for finding that maintaining a cable like the one claimed to have been installed, under the circumstances shown, is not a matter of common usage and necessarily involves a risk of serious harm to . . . [plaintiff] or any others who might be riding on the road under the conditions as then existed.  From the record it appears that it could be found that ordinary care would have reduced the risk of harm, but, under the circumstances presented, it would not eliminate it.

*Id*. at 838-39.  The Supreme Court further added that "[i]t was not the hanging of a cable per se that constituted the ultra-hazardous activity, but the hanging of an unmarked cable at a dangerous height in an area in which the landowner knows there are people traveling on four-wheelers."  *Id*. at 839.

In the present case, Plaintiffs acknowledge that developing campsites in the APRA is not an ultra-hazardous activity per se.  Plaintiffs argue that the government created an ultra-hazardous condition when it developed the campsites in a 100-year floodplain and failed to warn or guard against the dangers of flash floods.  The present case, however, is unlike *Carr*, where special circumstances existed to create an ultra-hazardous condition or activity.

In *Carr*, the landowner's agent knew that the plaintiff was riding an ATV on the property and placed an unmarked, steel cable across a paved road knowing that it could pose a latent danger to those riding around on the property.  In the present case, there is no evidence that the government

knew of any latent danger associated with placing the Loop D campsites along the Little Missouri River and placed them there anyway.  In fact, there is evidence supporting the government's contention that it reasonably believed that it placed the Loop D campsites outside of the 100-year floodplain.  Based on these facts, the Court concludes that the government's placement of the Loop D campsites did not create an ultra-hazardous condition within the meaning of the § 307(1) exception.  Therefore, the § 307(1) exception does not apply.

### B.  § 307(2) Exception

Immunity under the ARUS does not apply where the landowner "charges the person or persons who enter or go on the land for the recreational use thereof."  Ark. Code Ann. § 18-11-307(2).  The term "charge" is defined as "an admission fee for permission to go upon or use the land, but does not include . . . [c]ontributions in kind, services, or cash paid to reduce or offset costs and eliminate losses from recreational use."  Ark. Code Ann. § 18-11-302(2).  Plaintiffs contend that the immunity provided by the ARUS is inapplicable because the government charged an overnight admission fee to use the APRA Loop recreational facilities.

No Arkansas court has considered the admission fee exception of the ARUS.  The Eighth Circuit, however, has found that a $15 nightly fee that a camper paid to rent a campsite was not "an admission fee to enter the park," but was used to offset costs and eliminate losses from recreational use. *Greika v. U.S.*, 281 Fed. Appx. 631, 633 (8th Cir. 2008) (construing the § 307(2) exception of the APRA).  Interpreting a similar Missouri statue in *Wilson v. U.S.*, 989 F.2d 953 (8th Cir. 1993), the Eighth Circuit found that a $2 fee to use land overnight was not an "admission fee" to enter the land, where the campers "entered the park without paying a fee."  989 F.2d at 957.  Other courts examining the same or nearly identical statutory language agree that the fee exception is triggered

-16-

by the charging of an admission fee and not by fees for particular recreational use. *See, e.g., Garrean v. City of Omaha*, 345 N.W.2d 309, 313 (Neb. 1984) (overruled on other grounds by *Bronsen v. Dawes Cnty,*, 722 N.W.2d 17 (2006)) (fee for overnight stay at camping pad does not trigger exception where general public could not enter the park without paying a fee); *Flohr v. Pa. Power & Light Co.*, 800 F. Supp. 1252, 1255 (E.D. Pa. 1992) (a fee of $57 to camp in a designated recreational area within a park for which no entry fee was charged did not trigger fee exception); *City of Lousiville v. Silcox*, 977 S.W.2d 254 (Ky. Ct. App. 1998) (fee to park at city park did not trigger fee exception because users were not charged a fee to enter the park).

In the present case, Plaintiffs allege that they paid a $16 nightly fee to rent a campsite at Loop D, which included access to a concrete pad for an RV, water and electrical connections, and access to a sewage dump station. Plaintiffs further allege that this fee was an overnight admission fee to use the Loop D recreational facilities and thus the § 307(2) exception applies. The Court disagrees. The plain language of the statute expressly defines "charge" as including fees for entry onto the land but excludes fees collected to offset the costs of maintaining recreational facilities. Cases construing the ARUS and similar statutes draw a distinction between admission fees for entry onto the land and recreation fees for particular uses, including the use of camping pads and cabins. The government has never charged an admission fee to enter the APRA or the Ouachita National Forest, including Loop D. These areas were open to the public for entry for daily use free of charge. Moreover, Ranger Watson testified in his deposition that eighty percent of the $16 fee collected in 2010 was used for maintenance and improvement, fifteen percent for collections, and five percent for providing envelopes, signs, and information regarding the fee. ECF No. 52-1, p. 11. Based on these facts, the

Court concludes that the $16 nightly fee to rent a campsite did not trigger the § 307(2) exception, and thus this exception does not apply.

## CONCLUSION

Although the Court is sympathetic to Plaintiffs because of the unfortunate and untimely deaths of twenty campers, the Court is required to determine immunity based upon the law as set forth above and as applied to the facts of this case.  The Court must therefore find, based upon the relevant facts and law, that Plaintiffs have failed to show the following: (1) that the government maliciously failed to guard or warn against an ultra-hazardous condition, structure, personal property, use, or activity actually known to the government to be dangerous; or (2) that the government charged persons to enter or go on land in the ARPA for recreational use.  Consequently, the government can avail itself of the immunity provided by the ARUS.

For these reasons, the Court finds that the government's Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF No. 31) should be and hereby is **GRANTED**.  Accordingly, the complaint in this case and the complaints in each member case are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**, this 28th day of March, 2016.


/s/ Susan O. Hickey
Susan O. Hickey
United States District Judge

-18-